**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| TRACY MCNEIL | : | CIVIL ACTION |
| | : | |
| v. | : | NO.  20-6319 |
| | : | |
| WELLS FARGO BANK, N.A. | : | |

## <u>MEMORANDUM</u>

KEARNEY, J.                                                                                   February 18, 2021

  Wells Fargo Bank admits it wrongly identified its depositor Tracy McNeil as deceased for a couple days in March 2020 in an internal bank alert.  Wells Fargo internally removed the alert within a couple days of learning of the error but did not tell Ms. McNeil of its internal correction and instead described ongoing investigations to assist her.  A federal agency then told her the Social Security Administration identified her as passing away in November 2019 on the same day her mom (with a different name) passed.  Ms. McNeil persuaded United States Congressperson Dwight Evans to contact the Social Security Administration and it corrected its mistaken records of her death on April 30, 2020.  Wells Fargo admitted its early March 2020 error and prompt corrective action in a May 11, 2020 letter.

  Ms. McNeil alleges Wells Fargo's error led to her losing CARES Act benefits, unemployment benefits, and possibly health coverage in the early days of COVID-19 mitigation. But she does not plead a fact allowing us to plausibly infer Wells Fargo's internal alert caused third parties to deny anticipated benefits.  We cannot plausibly infer a nexus between federal and state government records and Wells Fargo's error. Ms. McNeil does not plead claims against Wells Fargo under a variety of state law theories and we dismiss her amended complaint.

I.      **Alleged Facts**

Wells Fargo depositor Tracy McNeil owned a small business.[1]   Ms. McNeil's mother, Valerie Conaughty, passed away unexpectedly on November 11, 2019.[2] A week later, on November 18, Ms. McNeil gave the Social Security Administration office in New Port Richey, Florida – where her mother resided – her mother's death certificate as part of her duties as Executor of her mother's estate.[3] The next month, Ms. McNeil provided her mother's death certificate to Wells Fargo where her mother also had accounts.[4]

Ms. McNeil "shopped, banked, traveled and generally engaged in daily life" without issue for the next few months.[5] For example, Ms. McNeil flew from Florida to Pennsylvania without problems on November 21, 2019.[6] She communicated with the United States Department of Health and Human Services' Office of Medicare and Medicaid "[o]n various occasions" from December 2019 through February 2020 regarding her private healthcare plan and prospective Medicaid policy.[7] The Office of Medicare and Medicaid never indicated the Federal Government classified Ms. McNeil as being deceased.[8] Ms. McNeil also interacted with Wells Fargo without issue during this time; she opened a new savings account on January 23, 2020 and used her accounts for day-to-day purposes between November 18, 2019 and March 2, 2020.[9]

On March 4, 2020, Ms. McNeil went to her local Wells Fargo branch seeking to deposit money into her account.[10] The bank teller assisting Ms. McNeil could not complete the deposit and directed Ms. McNeil to another employee, Yanice Williams.[11] Ms. Williams worked to resolve Ms. McNeil's deposit issue for approximately ninety minutes.[12] Ms. Williams then disclosed Wells Fargo updated its computers on March 2, 2020 "and as an apparent result of a Wells Fargo computer error during the system update," Wells Fargo wrongfully designated Ms. McNeil as "deceased" and froze her accounts as a result.[13] Ms. Williams showed Ms. McNeil the computer

screen reflecting the "deceased" notation.[14] After speaking to a branch manager and a co-worker, Ms. Williams informed Ms. McNeil she could not access her accounts until she signed a "Certificate Declaration of Life."[15] Ms. McNeil signed the Declaration the same day.[16]

Three weeks later, an employee of the Office of Medicare and Medicaid told Ms. McNeil of a document from the Social Security Administration classifying Ms. McNeil as "deceased" as of November 11, 2019.[17] The employee told Ms. McNeil it listed her date of death as November 11, 2019.[18] The employee said "you've got a problem on your hands" and "this is a big deal," and instructed Ms. McNeil to resolve the issue with the Social Security Administration immediately.[19] "In a state of shock, [Ms.] McNeil realized this [the Social Security reporting] was *likely related* to the aforementioned misclassification of her vital status by Wells Fargo, which she now saw was not confined to the bank."[20]  She assumed Wells Fargo caused the Social Security Administration to misrepresent her as deceased.  She apparently did not assume the converse: the Social Security Administration's misreporting caused Wells Fargo to issue its internal alert.

Ms. McNeil called the Social Security Administration later the same day.[21]  A federal employee confirmed the Social Security Administration classified Ms. McNeil as having died on November 11, 2019 (the date of her mom's passing).[22] The employee told her the Social Security Administration deactivated her social security number.[23]

Ms. McNeil called Wells Fargo the next day "to alert [Wells Fargo] of the downstream impact of the [b]ank's misclassification" and to resolve the issue.[24] After waiting on hold for over two hours, she could not connect with Wells Fargo employees.[25] She called Wells Fargo again the next day and spent approximately four and a half hours on the phone; Wells Fargo "escalated" her issue four times and eventually assigned her matter to the "highest level" of the "Executive Office

of Consumer Lending in the Resolution and Remediation Division."[26] Wells Fargo told Ms. McNeil they would reach out to her "within days" to resolve the issue.[27]

Ms. McNeil eventually contacted the United States Representative Dwight Evans of Philadelphia, who then worked with Ms. McNeil to resolve the Social Security Administration's misclassification of Ms. McNeil.[28] On April 30, 2020, the Social Security Administration informed Ms. McNeil it "recently discovered that [their] records wrongly showed [her] as deceased."[29] The Social Security Administration immediately removed Ms. McNeil's information from the Death Master File – where it compiles death information from various sources – as soon as it learned of the error.[30] On May 11, 2020, Wells Fargo told Ms. McNeil it "verified the death alert was inadvertently placed on [her] account on March 2, 2020" and removed the alert two days later."[31]

In mid-March 2020, Ms. McNeil closed her yoga studio temporarily due to the COVID-19 pandemic and the resulting statewide shutdown order.[32] She could not receive CARES Act stimulus funds or file for unemployment until May 19, 2020 because these government agencies misclassified her as deceased.[33] She also learned her health insurer cancelled her coverage as of June 1, 2020 because of her deceased status.[34]

## II.     Analysis

Ms. McNeil seeks damages for Wells Fargo's misclassification of her as "deceased." She claims Wells Fargo is liable for negligence, breach of fiduciary duty, defamation, negligent training and supervision, intentional infliction of emotional distress, and violating Pennsylvania's Unfair Trade Practices and Consumer Protection Law.[35]

Wells Fargo moves to dismiss arguing Ms. McNeil fails to plausibly allege a causal connection between Wells Fargo's computer error and the Social Security Administration's misclassification of her as deceased.[36]  Even if she does, Wells Fargo argues Ms. McNeil fails to

state the required elements for each of her claims.[37] Ms. McNeil counters she plausibly alleges Wells Fargo's conduct led to the Social Security Administration's misclassification; she further argues she does not have to allege the precise details of the causal chain at this early stage.[38] We find Ms. McNeil fails to state any of her claims and dismiss the complaint without prejudice. We cannot plausibly infer Wells Fargo directly or indirectly caused the United States, the Commonwealth, or even her health insurer to deny benefits.  Wells Fargo's error and extended lulling while "investigating" her claim which it immediately corrected in its internal records does not automatically impose liability without pleading some fact allowing us to plausibly infer Wells Fargo caused these independent actors to also find her deceased.  We cannot assume the Social Security Administration's classification is – to use Ms. McNeil's term – "likely related" to Wells Fargo's error.   Legal causation is different the Ms. McNeil's "likely related" speculation. This speculative leap is not plausible absent some fact showing Wells Fargo did notify the Social Security Administration of her passing or even of a legal obligation for it to do so.  Ms. McNeil does not plead an obligation for a bank to tell the Social Security Administration if one of its depositors died.  We cannot simply speculate Wells Fargo contacted Social Security of Ms. McNeil's alleged death.

A.    **Ms. McNeil does not plead a claim under the Consumer Protection Law.**

Ms. McNeil does not plead a claim under the Consumer Protection Law because she did not plead she relied on the misclassification nor were her damages proximately caused by Wells Fargo's misrepresentations regarding the handling of her claim**.**

The Pennsylvania General Assembly included a catchall provision in the Consumer Protection Law prohibiting persons from "engaging in . . . deceptive conduct which creates a likelihood of confusion or misunderstanding."[39] To state a claim under this catchall provision, Ms.

McNeil must allege: (1) a "deceptive act, that is conduct that is likely to deceive a consumer acting reasonably under similar circumstances;" (2) justifiable reliance, meaning she engaged in some detrimental activity because of the deceptive conduct; and (3) this justifiable reliance caused ascertainable loss.[40] Ms. McNeil alleges Wells Fargo violated the Consumer Protection Law by wrongfully classifying her as "deceased," failing to rectify the misclassification, failing to have proper safeguards in place, repeatedly making false assurances they would rectify the misclassification, and falsely representing they would call her back with information about the misclassification.

These plead facts do not support a claim under the Consumer Protection Law.

Ms. McNeil cannot base her Consumer Protection Law claim on Wells Fargo wrongly classifying her as deceased because she fails to plead she justifiably relied on the misclassification. Whether a plaintiff justifiably relies on a misrepresentation "depends on whether the recipient knew or should have known that the information supplied was false."[41] "If a man knows the truth about the representation, he is neither deceived nor defrauded, and any loss he may sustain is in effect self-inflicted."[42] While justifiable reliance is typically a question of fact, a court may determine at the motion to dismiss stage whether allegations of justifiable reliance fail as a matter of law.[43] Ms. McNeil fails to allege she relied on the deceased misclassification. Her allegations instead demonstrate just the opposite – Ms. McNeil always knew of its falsity and began working immediately to rectify the error.

Wells Fargo's alleged failure to rectify the misclassification or to have safeguards in place is also not actionable conduct under the Consumer Protection Law. Nonfeasance, or the mere failure to perform a contractual obligation, is not sufficient to state a claim under the Law.[44] For example, in *Gordon v. Pennsylvania Blue Shield*,[45] the Pennsylvania Superior Court affirmed the

dismissal of a Consumer Protection Law claim based only on an alleged failure to pay benefits to which the plaintiff felt entitled because "the alleged improper refusal to act on [plaintiff's] behalf in this instance does not constitute actionable misfeasance."[46] Consistent with this reasoning from the Pennsylvania appellate court, Ms. McNeil's allegations regarding Wells Fargo's mere failure to act do not state a Consumer Protection Law claim.

We are left with Wells Fargo's alleged misrepresentations regarding the resolution of Ms. McNeil's misclassification through its employee making allegedly false assurances of working to resolve her issue and would call her back regarding their progress. While this can be considered actionable misfeasance under the Law, Ms. McNeil's claim still falls short because she fails to plead she suffered an ascertainable loss because of these false assurances. To state a claim under the Consumer Protection Law, Ms. McNeil "is required to plead facts demonstrating an ascertainable loss by 'point[ing] to money or property that he would have had but for the defendant's [deceptive] actions.'"[47] The loss resulting from the deceptive action must be "actual" and "non-speculative."[48]

Ms. McNeil argues she relied on Wells Fargo's representations regarding its resolution of the misclassification because she delayed taking matters into her own hands for the five days she waited for Wells Fargo to call her back. Her losses stemming from this alleged reliance during this relatively short period, however, are wildly speculative at best. She argues, for example, "[p]erhaps if Wells Fargo called McNeil back on March 27, 2020 and assisted her in rectifying her vital status, the damages accrued during the final days of March 2020 and the duration of April 2020 and May 2020 would not have accrued" and "[p]erhaps if Wells Fargo called back on March 27 or March 28, 2020 and simply advised that it could not assist her, McNeil would have contacted the Attorney General's Office, her Representative earlier and the status would have been rectified earlier."[49]

This speculation does not constitute actual loss to money or property and is insufficient as presently plead to state a claim under the Consumer Protection Law.

Ms. McNeil also admits alleged loss to money or property – loss of financial assistance, loans, relief checks, CARES Act stimulus funds, health insurance, and unemployment benefits – stem from the misclassification of her as deceased rather than Wells Fargo's subsequent representations regarding the handling of her concerns.[50] Because Ms. McNeil fails to allege ascertainable loss for the five days she relied on Wells Fargo's representations they would resolve her misclassification issue, her Consumer Protection Law claim fails.[51]

**B.      Ms. McNeil does not plead a causal connection between Wells Fargo's negligence and the denial of anticipated benefits from unrelated entities.**

Ms. McNeil pleads Wells Fargo's admitted error.  But she does not plead how its error caused her damage other than speculating Wells Fargo must have something to do with her harm because the denial of benefits occurred after she learned of Wells Fargo's error.   There is no plead nexus between Wells Fargo's error and the lost benefits possibly available to her from the United States, Commonwealth, or her health insurer.

To state a negligence claim under Pennsylvania law, Ms. McNeil must allege: "(1) a duty or obligation recognized by law; (2) a breach of that duty; (3) a causal connection between the defendant's breach of duty and the plaintiff's injury; and (4) actual damage."[52] To establish a causal connection, Ms. McNeil must allege both cause-in-fact and proximate cause.[53] Our Court of Appeals described these causation components as follows:

> Cause in fact or "but for" causation requires proof that the harmful result would not have come about but for the conduct of the defendant. Proximate cause, in addition, requires proof that the defendant's conduct was a substantial contributing factor in bringing about the harm alleged. Where the relevant facts show either that the defendant was not responsible for the injury, or that the causal connection between the defendant's negligence and the plaintiff's injury is remote, the question of causation is decided by the court as a matter of law.[54]

Pennsylvania courts assess proximate cause by considering three factors: "(1) the number of factors other than the actor's conduct that contributed to producing the harm and the extent of their contribution; (2) whether the actor's conduct created a force or series of forces that were in continuous and active operation up to the time of the harm, or created a situation harmless unless acted upon by other forces for which the actor is not responsible; and (3) the lapse of time between the actor's conduct and the harm."[55]

Ms. McNeil fails to allege Wells Fargo's misclassification as of March 2, 2020, which Wells Fargo resolved internally in two days, caused – either factually or proximately – other independent state agencies and her health insurer to deny her benefits or coverage. Ms. McNeil's conclusory allegation she could not procure stimulus funds, file for unemployment, or receive any loans or grants "[a]s a result" of Wells Fargo's misclassification is wholly unsupported by any well-plead allegations.

She instead attempts to support her theory of causation with pure conjecture. After a federal employee informed her the *Social Security Administration* provided the Office of Medicare and Medicaid a letter declaring her deceased, Ms McNeil, "[i]in a state of shock,… realized this was *likely related* to the aforementioned misclassification of her vital status by Wells Fargo." She then contacted Wells Fargo "to alert of the downstream impact of [Wells Fargo's] misclassification."

Ms. McNeil's belief, unsupported by anything other than the fact she did not become aware of the federal government's misclassification until after Wells Fargo's computer error, is insufficient for us to infer a plausible nexus between Wells Fargo's misclassification and her damages. While Ms. McNeil correctly argues she is not required to plead the *specific details* regarding the transmission of information between Wells Fargo and the Federal Government, she must at least allege a *fact* which could allow us to plausibly infer Wells Fargo communicated this

misinformation to the Federal Government to establish some causal connection between Wells Fargo's conduct and her losses.[56]  She has not done so in two attempts at pleading causation.

### C.    Ms. McNeil does not plead a fiduciary relationship.

Wells Fargo argues Ms. McNeil's breach of fiduciary duty claim fails as a matter of law because, absent extraordinary circumstances not alleged, banks do not typically owe their customers fiduciary duties.[57] Ms. McNeil does not argue there exists as a matter of law a fiduciary relationship between a bank and its customers.[58] She instead argues she pleads circumstances – the "escalation" of her case to the "highest level" of an office within Wells Fargo – creating a fiduciary relationship.[59] We agree with Wells Fargo.

"A fiduciary duty is the highest duty implied by law" which "will only be imposed where the attendant conditions make it certain" such a relationship exists.[60] Under Pennsylvania law, a fiduciary duty can exist as a matter of law or as a matter of fact.[61] A fiduciary duty exists as a matter of law in some types of relationships such as "[p]rincipal and agent, trustee and cestui que trust, attorney and client, guardian and ward, and partners."[62] Where a fiduciary duty does not exist as a matter of law, a fiduciary duty may be established "when the circumstances make it certain the parties do not deal on equal terms, but, on the one side there is an overmastering influence, or, on the other, weakness, dependence or trust, justifiably reposed."[63] "An overmastering influence exists when the position of the parties is so extremely one sided that one party acts as advisor or counselor to another who is in a position of pronounced economic and intellectual weakness."[64] A fiduciary duty will not be imposed in an ordinary business relationship simply because one party possesses superior knowledge or expertise.[65]

Courts dismiss breach of fiduciary duty claims where the customer fails to plead the existence of a fiduciary relationship.[66] In *Reginella*, for example, Judge Hornak dismissed a breach

of fiduciary duty claim because "[e]ven if [plaintiff] were to prove every fact it alleges in its [c]omplaint . . . the facts fail to establish that a fiduciary relationship existed between it and [defendant]."[67] Judge Hornak found the plaintiff failed to allege it "was uniquely vulnerable to manipulation and exploitation" and only alleged it relied on the defendant's expertise and performance.[68] The relationship as alleged "d[id] not go so far as to give [defendant] an unfettered ability to exert complete control over the relationship without incurring any risk to its own interests."[69]

Ms. McNeil similarly fails to allege a fiduciary relationship between herself and Wells Fargo. Ms. McNeil, a small business owner with multiple Wells Fargo accounts, fails to demonstrate how Wells Fargo exercised an overmastering influence over her or how she was uniquely vulnerable to that influence. Like in *Reginella*, Ms. McNeil merely alleges she relied on Wells Fargo's expertise in resolving the issues created by its misclassification of her as deceased and that Wells Fargo worked internally to resolve these issues. These allegations represent an ordinary business relationship rather than a fiduciary relationship.

### D.      Ms. McNeil does not plead Wells Fargo published its misclassification.

Ms. McNeil claims Wells Fargo defamed her by reporting her as deceased in its internal alert. Wells Fargo argues her claim fails because a mistaken reporting of death cannot be defamatory as a matter of law. While we disagree with Wells Fargo on this reasoning, we still find Ms. McNeil's claim deficient because she fails to allege Wells Fargo published its misclassification. [70]

To state a defamation claim, Ms. McNeil must demonstrate: (1) the defamatory character of the communication; (2) its publication by Wells Fargo; (3) its application to Ms. McNeil; (4) the understanding by the recipient of its defamatory meaning; (5) the understanding by the

recipient of it as intended to be applied to Ms. McNeil; (6) special harm resulting to Ms. McNeil from its publication; and (7) abuse of a conditionally privileged occasion.[71] To establish publication, she must demonstrate "communication of the information to at least one person other than the person defamed."[72]

Ms. McNeil's defamation claim fails because she fails to allege Wells Fargo published its misclassification of her as deceased to any other person. Ms. McNeil alleges only that Wells Fargo's records erroneously reflected her as deceased for two days because of a computer update. As explained in our analysis of Ms. McNeil's deficient negligence claim, however, she fails to plausibly allege Wells Fargo transmitted the erroneous information from its own records to anyone else. Without this transmission of information, Ms. McNeil cannot state a claim for defamation.

### E.     Ms. McNeil does not plead negligent supervision and training.

Wells Fargo argues Ms. McNeil fails to state a claim for negligent supervision because she does not allege a Wells Fargo employee acting outside the scope of her employment intended to harm her.[73] We agree with Wells Fargo as Ms. McNeil fails to allege intentional and foreseeable harm committed by Wells Fargo employees outside the scope of their employment.

Liability for negligent supervision may be established under two theories.[74] Under the first theory, "the employer must exercise reasonable care to control his employee 'while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them.'"[75]

Under the second theory of liability:

A person conducting an activity through . . . agents is subject to liability for harm resulting from his conduct if he is negligent or reckless:
(a) in giving improper or ambiguous orders or in failing to make proper regulations; or
(b) in the employment of improper persons or instrumentalities in work involving risk of harm to others:

(c) in the supervision of the activity; or

(d) in permitting, or failing to prevent, negligent or other tortious conduct by persons, whether or not his servants or agents, upon premises or with instrumentalities under his control.[76]

Under either theory, Wells Fargo can only be liable for negligent supervision "if it knew, or should have known, that 'the employee ha[d] dangerous propensities that might cause harm to a third party.'"[77]

Ms. McNeil's claim fails under both theories. She fails under the first theory because she does not allege Wells Fargo employees acted outside of the scope of their employment in inadvertently misclassifying her as deceased or attempting, and ultimately failing, to help her resolve the misclassification. Her claim also fails under the second theory – and the first – because she fails to allege foreseeability; she does not allege Wells Fargo knew or should have known its employees had propensities to cause harm of a type anywhere close to this misclassification. Ms. McNeil does not point to a specific Wells Fargo employee besides Ms. Williams, who merely informed her a computer update erroneously led her to be declared deceased.[78]

**F.      Ms. McNeil does not plead intentional infliction of emotional distress.**

Wells Fargo argues Ms. McNeil's claim for intentional infliction of emotional distress fails because she does not allege extreme or outrageous conduct.[79] We agree with Wells Fargo as we cannot plausibly infer extreme or outrageous conduct.

A claim for intentional infliction of emotional distress under Pennsylvania law requires four elements: "(1) the conduct must be extreme and outrageous; (2) the conduct must be intentional or reckless; (3) it must cause emotional distress; and (4) the distress must be severe."[80] To meet the first element, the conduct "must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly

intolerable in a civilized society."[81] "It is for the court to determine in the first instance whether the conduct is extreme and outrageous, such that recovery may be permitted."[82]

Ms. McNeil's claim fails because her allegations regarding Wells Fargo's conduct – including its unintentional misclassification of her as deceased and its subsequent failure to remediate the alleged impact of the error– fall far short of the extreme or outrageous conduct necessary to support her intentional infliction of emotional distress claim. As our Court of Appeals explained, "Pennsylvania courts have found extreme and outrageous conduct only in the most egregious of situations, such as mishandling of a corpse, reckless diagnosis of a fatal disease, and having sexual contact with young children."[83]

In *Estate of Rennick v. Universal Credit Services, LLC*, Judge Baylson dismissed a claim for intentional infliction of emotional distress premised on an inadvertent reporting error resulting in the plaintiff being falsely classified as deceased.[84] He found this error did not rise to the level of "extreme or outrageous conduct with the purpose of inflicting emotional distress" sufficient to support the claim.[85] Our Court of Appeals similarly affirmed the dismissal of a claim for intentional infliction of emotional distress based on the publication of an article suggesting the plaintiff participated in a sex scandal because "[a]lthough [it] is unfortunate, it does not rise to the level of conduct necessary" to state such a claim.[86]

We  agree with the reasoning of Judge Baylson and our Court of Appeals based on very similar allegations. Ms. McNeil's intentional infliction of emotional distress is also deficient. While it is unfortunate a computer update led to Wells Fargo unintentionally classifying her as deceased and Wells Fargo failed to meaningfully deal with the issue, this alleged conduct does not state a claim for intentional infliction of emotional distress.

III.     **Conclusion**

We grant Wells Fargo's Motion to dismiss in its entirety without prejudice to Ms. McNeil timely filing a second amended Complaint pleading facts, consistent with Fed.R.Civ.P..11, allowing us to plausibly infer Wells Fargo reported its error to the Social Security Administration and then possibly proceeding on a negligence or defamation claim.  We will close the case absent a timely amendment.

---

[1] ECF Doc. No. 11 ¶¶ 20-21.

[2] *Id.* ¶ 22.

[3] *Id.* ¶¶ 23-24.

[4] *Id.* ¶ 25.

[5] *Id.* ¶¶ 27-33.

[6] ECF Doc. No. 11 ¶ 28.

[7] *Id.* ¶ 29.

[8] *Id.* ¶ 30.

[9] *Id.* ¶¶ 31-33.

[10] *Id.* ¶ 34.

[11] ECF Doc. No. 11 ¶ 35.

[12] *Id.* ¶ 36.

[13] *Id.* ¶¶ 37-38.

[14] *Id.* ¶ 38.

[15] *Id.* ¶¶ 39-40.

[16] ECF Doc. No. 11 ¶ 41.

[17] *Id.* ¶¶ 46-47.

[18] *Id.* ¶¶ 49-50.

[19] *Id.* ¶¶ 51-52.

[20] *Id.* ¶ 48 (emphasis added).

[21] *Id.* ¶ 54.

[22] ECF Doc. No. 11 ¶ 55.

[23] *Id.* ¶ 56.

[24] *Id.* ¶ 63.

[25] *Id.*

[26] *Id.* ¶¶ 64-65.

[27] ECF Doc. No. 11 ¶ 66.

[28] ECF Doc. No. 11 ¶ 74.

[29] ECF Doc. No. 12-3 at 2.

[30] *Id.*

[31] ECF Doc. No. 12-4 at 2.

[32] ECF Doc. No. 11 ¶¶ 43-45.

[33] *Id.* ¶¶ 71, 78.

[34] *Id.* ¶ 79.

[35] 73 Pa. Stat. Ann. §§ 201–1 *et seq.* ("Consumer Protection Law")

[36] ECF Doc. No. 14-1 at 10-13. Federal Rule of Civil Procedure 12(b)(6) requires a complaint to state a claim upon which relief can be granted. Fed. R. Civ. P. (12)(b)(6). The purpose of Rule 12(b)(6) is to test the sufficiency of the factual allegations in a complaint. *Sanders v. United States*, 790 F. App'x 424, 426 (3d Cir. 2019). If a plaintiff is unable to plead "enough facts to state a claim to relief that is plausible on its face," the court should dismiss the complaint. *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Kajla v. U.S. Bank Nat'l Ass'n as Tr. for Credit Suisse First Bos. MBS ARMT* 2005-8, 806 F. App'x 101, 104 n.5 (3d Cir. 2020) (quoting *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 84 (3d Cir. 2011)).

"A claim has facial plausibility when the plaintiff pleads factual content . . . allow[ing] the court to draw the reasonable inference . . . the defendant is liable for the misconduct alleged." *Robert W.*

*Mauthe M.D., P.C. v. Spreemo, Inc.*, 806 F. App'x 151, 152 (3d Cir. 2020) (quoting *Zuber v. Boscov's*, 871 F.3d 255, 258 (3d Cir. 2017)). While "[t]he plausibility standard is not akin to a 'probability requirement,'" it does require the pleading show "more than a sheer possibility . . . a defendant has acted unlawfully." *Riboldi v. Warren Cnty. Dep't of Hum. Servs. Div. of Temp. Assistance & Soc. Servs.*, 781 F. App'x 44, 46 (3d Cir. 2019) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A pleading that merely 'tenders naked assertion[s] devoid of further factual enhancement' is insufficient." *Id.* (quoting *Iqbal*, 556 U.S. at 668).

In determining whether to grant a 12(b)(6) motion, "we accept all well-pleaded allegations as true and draw all reasonable inferences in favor of the plaintiff" but "disregard threadbare recitals of the elements of a cause of action, legal conclusions, and conclusory statements." *Mauthe*, 806 F. App'x at 152 (quoting *City of Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp.*, 908 F.3d 872, 878-79 (3d Cir. 2018)). Our Court of Appeals requires us to apply a three-step analysis under a 12(b)(6) motion: (1) "it must 'tak[e] note of the elements [the] plaintiff must plead to state a claim;'" (2) "it should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth;'" and, (3) "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quoting *Iqbal*, 556 U.S. at 675, 679).

[37] ECF Doc. No. 14-1 at 13-26.

[38] ECF Doc. No. 15 at 10-13. We do not analyze the causation issue separately but instead in the context of Ms. McNeil's specific claims.

In ruling on the motion to dismiss, Wells Fargo asks us to consider a download from the Social Security Administration's "Death Master File" and an accompanying declaration attached as exhibits to its motion. *See* ECF Doc. No. 14-3. "To decide a motion to dismiss, courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint, and matters of public record." *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (quoting *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993)). An exception to this general rule is that "a document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment." *Id.* (citations and quotations omitted).

We cannot consider the Death Master File because it is neither a public record nor is it integral to Ms. McNeil's claims. "A public record is not simply one that is accessible to the public, but rather one to which 'the public ha[s] unqualified access,'" like SEC filings and published reports of administrative bodies. *In re Egalet Corp. Sec. Litig.*, 340 F. Supp. 3d 479, 496 (E.D. Pa. 2018) (citing *Pension Benefit Guar. Corp.*, 998 F.2d at 1197). The public does not have unqualified access to the Death Master File because individuals must file a request and pay fees to access it. *See Limited Access Death Master File*, Nat'l Tech. Info. Serv., https://classic.ntis.gov/products/ssa-dmf/# (last accessed Feb. 12, 2021); *see also Pension Benefit Guar. Corp.*, 998 F.2d at 1197 (finding a record only available through a FOIA request did not constitute a public record). The Death Master File is also not integral to Ms. McNeil's claims against Wells Fargo because she alleges Wells Fargo independently classified her as deceased. *See*

*Tomaszewski v. Trevena, Inc.*, No. 18-4378, 2020 WL 5095865, at \*4-\*5 (E.D. Pa. Aug. 28, 2020) ("[W]hat is critical is whether the claims in the complaint are 'based' on an extrinsic document and not merely whether the extrinsic document was explicitly cited.") (citations omitted).

[39] 73 Pa. Cons. Stat. § 201-2(4)(xxi) (2021).

[40] *Plumbers' Local Union No. 690 Health Plan v. Apotex Corp.*, No. 16-665, 2017 WL 4235773, at \* 7 (E.D. Pa. Sept. 25, 2017) (quoting *Seldon v. Home Loan Servs., Inc.*, 647 F. Supp. 2d 451, 470 (E.D. Pa. 2009)).

[41] *Corsale v. Sperian Energy Corp.*, 412 F. Supp. 3d 556, 566 (W.D. Pa. 2019) (quoting *Porreco v. Porreco*, 811 A.2d 566, 571 (Pa. 2002)).

[42] *Id.* (quoting *Emery v. Third Nat'l Bank of Pittsburgh*, 162 A. 281, 284 (Pa. 1932)).

[43] *Plumbers' Local Union No. 690 Health Plan,* 2017 WL 4235773 at \* 7 (citing *Hunt v. U.S. Tobacco Co.*, 538 F.3d 217, 227 (3d Cir. 2008)).

[44] *Post v. Liberty Mut. Group, Inc.*, No. 14-238, 2014 WL 2777396, at \*2 (E.D. Pa. June 18, 2014).

[45] 548 A.2d 600 (Pa. Super. Ct. 1988).

[46] *Gordon v. Pa. Blue Shield*, 548 A.2d 600, 604 (Pa. Super. Ct. 1988).

[47] *Hall v. Equifax Info. Servs. LLC*, 204 F. Supp. 3d 807, 812 (E.D. Pa. 2016) (quoting *Walkup v. Santander Bank, N.A.*, 147 F. Supp. 3d 349, 358 (E.D. Pa. 2015)).

[48] *Id.* (quoting *Levy-Tatum v. Navient and Sallie Mae Bank*, No. 15-3794, 2016 WL 75231, at \*9 (E.D. Pa. Jan 7, 2016)).

[49] ECF Doc. No. 15 at 15.

[50] *See, e.g.*, ECF Doc. No. 11 ¶ 71 ("As a result of the false classification that Wells Fargo made to her vital status, McNeil was unable to procure CARES Act stimulus funds, file for unemployment and was resulted ineligible for loans and grants which she otherwise would have obtained."); *id.* ¶ 79 ("In addition, in August 2020, McNeil learned that because of her 'deceased' status, her health insurance policy was cancelled as of June 1, 2020.").

[51] Ms. McNeil's damages from emotional distress and from wasting time and effort on the phone with Wells Fargo and are not cognizable under the Consumer Protection Law. *See Chalal v. Wells Fargo Asset Sec. Corp.*, No. 17-516, 2018 WL 11099082, at \*1 n.2 (E.D. Pa. May 7, 2018) (finding allegations of "wasted time, money, and effort" do not constitute ascertainable losses under the Consumer Protection Law); *Allen v. Wells Fargo, N.A.*, No. 14-5283, 2015 WL 5137953, at \*9 (E.D. Pa. Aug. 28, 2015) ("Claims for emotional distress are not compensable under the [Consumer Protection Law].") (citing 73 Pa. Cons. Stat. § 201–9.2)).

---

[52] *Fekete v. Nat'l R.R. Passenger Corp.*, No. 11-6570, 2011 WL 5572626, at *2 (E.D. Pa. Nov. 16, 2011).

[53] *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 366 (3d Cir. 1990).

[54] *Id.* at 366-67.

[55] *Heeter v. Honeywell International, Inc.*, 195 F. Supp. 3d 753, 759 (E.D. Pa. 2016) (citing *Vattimo v. Lower Bucks Hosp., Inc.*, 465 A.2d 1231, 1234 (Pa. 1983)).

[56] *See id.* at 757-61 (dismissing negligence claim because "taking the well-pleaded facts in Plaintiff's Amended Complaint as true and all reasonable inferences that can be drawn therefrom, even when construed in the light most favorable to Plaintiff, Plaintiff cannot show that Defendants' proximately caused the claimed harm").

[57] ECF Doc. No. 14-1 at 20-21.

[58] ECF Doc. No. 15 at 18-19.

[59] *Id.*

[60] *Yenchi v. Ameriprise Fin., Inc.*, 161 A.3d 811, 819-20 (Pa. 2017).

[61] *Kremsky v. Kremsky*, 758 F. App'x 236, 239 (3d Cir. 2018) (citing *Basile v. H & R Block, Inc.*, 52 A.3d 1202, 1210 (Pa. 2012)).

[62] *Yenchi*, 161 A.3d at 820.

[63] *Id.* (quoting *Frowen v. Blank*, 425 A.2d 412, 416-17 (Pa. 1981)).

[64] *Reginella Constr. Co., Ltd. v. Travelers Cas. And Sur. Co. of Am.*, 949 F. Supp. 2d 599, 613 (W.D. Pa. 2013) (citations and quotations omitted).

[65] *Id.* at 612-13.

[66] *Dolan v. PHL Variable Ins. Co.*, No. 15-1987, 2017 WL 4812308, at *10-*12 (W.D. Pa. Oct. 25, 2017) ("Courts within the Third Circuit have regularly dismissed claims for failing to properly plead a fiduciary or contractual relationship.").

[67] *Reginella Constr. Co., Ltd.*, 949 F. Supp. 2d at 613.

[68] *Id.* at 613-14.

[69] *Id.* at 613.

[70] "A statement is defamatory if it tends to harm the reputation of another so as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Byars*

*v. Sch. Dist. of Phila.*, 942 F. Supp.2d 552, 563-64 (E.D. Pa. 2013) (citing *Tucker v. Phila. Daily News*, 848 A.2d 113, 124 (Pa. 2004)). Whether a statement is defamatory is a threshold question of law for a court to decide by "look[ing] at the language of the communication, its implications and the context in which it was made, and determin[ing] how a reasonable person would interpret the statement." *Id.* at 564 (citations omitted); *Gibney v. Fitzgibbon*, 547 F. App'x 111, 113 (3d Cir. 2013). "If upon review of the challenged publication the court determines that there is both an innocent and alternate defamatory interpretation, the issue must proceed to the jury." *Byars*, 942 F. Supp. 2d at 564 (citing *Dougherty v. Boyertown Times*, 547 A.2d 778, 783 (Pa. Super. Ct. 1988)).

The mistaken reporting of Ms. McNeil's death could be construed as defamatory because it could deter third parties from dealing with her. In *Estate of Rennick v. Universal Credit Services, LLC*, Judge Baylson declined to dismiss a claim for defamation based on a credit report which erroneously listed the plaintiff as deceased because the report led to a broker denying the plaintiff a home equity line of credit. No. 18-3881, 2019 WL 196539, at *8 (E.D. Pa. Jan. 15, 2019). Judge Baylson rejected the theory that the report could not be defamatory because it did not harm the reputation of the plaintiff who "was so obviously not deceased." *Id.* Judge Baylson instead found the inaccurate report could be defamatory because the plaintiff alleged the report could – and did – deter third parties, like the broker, from associating or dealing with him. *Id.* As in *Rennick*, Ms. McNeil alleges Wells Fargo's false reporting of her death led to problems with her health insurance, stimulus funds, and unemployment, at least temporarily. But she does not plead how.

[71] *Byars v. Sch. Dist. of Phila.*, 942 F. Supp.2d 552, 563 (E.D. Pa. 2013) (citing 42 Pa. Cons. Stat. § 8343(a)).

[72] *Cushman v. Trans Union Corp.*, 115 F.3d 220, 230 (3d Cir. 1997) (citing *Flaxman v. Burnett*, 574 A.2d 1061, 1066 (Pa. Super. Ct. 1990)).

[73] ECF Doc. No. 14-1 at 23-24.

[74] *Hena v. Target Corp.*, No. 20-3060, 2020 WL 6321581, at *2 (E.D. Pa. Oct. 28, 2020).

[75] *Id.* (quoting Restatement (Second) of Torts § 317) (emphasis omitted).

[76] *Hena*, 2020 WL 6321581 at *2 (citing Restatement (Second) of Agency § 213 (Am. Law. Inst. 1958)).

[77] *Court v. Loews Phila. Hotel, Inc.*, No. 16-4848, 2017 WL 569522, at *4 (E.D. Pa. Feb. 13, 2017) (quoting *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 491 (3d Cir. 2013)).

[78] *See Hena*, 2020 WL 6321581 at *3 (dismissing negligent supervision claim because "even if the [c]ourt agreed that some employee must have been incompetent for this accident to have occurred, which it does not, [p]laintiff has not pleaded any factual allegations that would lead to the inference that [defendant] was aware or should have been aware that some employee was incompetent or incapable of performing the job").

[79] ECF Doc. No. 14-1 at 24-26.

---

[80] *Miller v. Comcast*, 724 F. App'x 181, 182 (3d Cir. 2018) (quoting *Bruffett v. Warner Commc'ns, Inc.*, 692 F.2d 910, 914 (3d Cir. 1982)). In satisfying the fourth element, Pennsylvania law requires a plaintiff show "some type of physical harm due to the defendant's outrageous conduct." *Allen*, 2015 WL 5137953 at *6 (quoting *DiLoreto v. Costigan*, 600 F.Supp.2d 671, 691 (E.D.Pa.2009), *aff'd*, 351 F. App'x 747 (3d Cir.2009)).

[81] *Cheney v. Daily News L.P.*, 654 F. App'x 578, 584 (3d Cir. 2016) (quoting *Hoy v. Angelone*, 720 A.2d 745, 754 (Pa. 1998)).

[82] *Id.* (citing *Small v. Juniata Coll.*, 682 A.2d 350, 355 (Pa. Super. Ct. 1996)).

[83] *Id.* at 583-84 (citing *Salerno v. Phila. Newspapers, Inc.*, 546 A.2d 1168, 1172 (Pa. Super. Ct. 1988)).

[84] No. 18-3881, 2019 WL 196539, at *4-*5 (E.D. Pa. Jan. 15, 2019)

[85] *Id.* at *5.

[86] *Cheney*, 654 F. App'x at 584.

21